Good morning. May it please the court. My name is Benjamin Pugh. I represent Vanguard Outdoor, LLC. With me is my associate, James Azadian, and I'd like to reserve two minutes for rebuttal, if I may. We heard a lot of facts just recently. What I'd like to focus on, though, is the city's scheme as a whole. What the law of the land is in the City of Los Angeles. The city has created numerous exceptions, and the city continues to create exceptions. And each time it's creating an exception, it does it for a different reason. And most of the reasons, as we heard with the creation of the Hollywood SUD, are for reasons diametrically opposed to the stated reasons supporting the ban. The general ban is supported, the city argues, because visual clutter is aesthetically displeasing and because it harms traffic safety. But when they create SUDs, when they've created the Hollywood SUD, the LA Live SUD, the Wilshire Grand SUD, the city has found the exact opposite. They found that super graphic signs are vibrant, lively, promote commerce, are good, and are not even traffic hazards. What this case presents is how many exceptions can the city make before it swallows the rule, before the underlying rationale of the rule is called into question and doesn't meet the central Hudson test, before the overall scheme is not narrowly tailored anymore. I represent Vanguard Outdoor, which is a small company. We don't have the financial resources to redevelop a $100 million building and provide the city with $900,000 worth of payments to be able to create an SUD and, in effect, buy the right to display offsite super graphic signs. There's no process that Vanguard can go through to be able to convince the city council or any executive that putting a super graphic sign on Vanguard's properties has the identical beneficial effects as putting a super graphic sign on any of the other properties within SUDs. If there's no procedure there and the city has used this SUD process to create exceptions that, under the rationale, specifically undermine the rationale of the general ban, what the city has, in effect, done is turned the SUD exception into a de facto licensing scheme where the city council has reserved to itself the right to pick and choose who can speak and the right to pick and choose who can speak for whatever reason they want. A large question is what category you call this type of activity by the city. One label is legislation. You know that legislation doesn't have the same constraints as licensing. What's your rationale for saying this is not legislation? The creation of an SUD is a legislative act, but that doesn't mean a legislative act is immune from the strictures of central Hudson or doesn't have to muster under the Constitution. If it's an executive act, then it's void for the mere unfettered discretion challenge. You don't even have to reach back into the reasons. So where do the restraints come on legislative action? They come from the central Hudson test, which applies to this. And the city has an affirmative burden. Once we show that speech that we are engaged in is not untruthful and not misleading, which there's no argument that our speech is truthful, not misleading, nothing different than anything going on in a current SUD. Once we make that showing, the city has to prove that its asserted rationale for banning speech, even if they do it in a legislative manner, advances compelling interests, is narrowly drawn or directly advances those compelling interests, and is narrowly drawn not to overburden the right of free speech. Are they really, I'm just curious, are they really banning speech as opposed to the place where you can speak? In other words, they're not saying you can't say whatever message you want to say. It's just that you can't do it in this four square block area and you can do it in another four square block area. It's not content based and it's not even saying you can't speak. It's basically a question of where you could put the signs. That is correct, but that brings up several additional issues. Because we're talking about a manner, a method of communication, and they're saying one property owner can use this method of communication and another property owner can't. Depending on where they're located. Depending on where they're located. Now when they make those decisions, and I'm not saying they can't. I'm not saying the city couldn't make the decision that a residential area is inappropriate for super graphic sign. The issue is they have to make that decision and they have to apply it uniformly. And I think the key to this case was expressed by Alan Bell, the acting deputy of the city's planning commission. When he complained, or he advised the city council that their continued creation of SUDs in the manner he quoted, or he called it, could be construed as willy-nilly, undermined the basis for the general ban. And what he said the city should do when it amends its sign code is this, quote, any such solution will need to result in a by right standard that will encompass any potential scenario to which its terms apply, period. Meaning that if the city makes a determination that super graphic signs are good in commercial areas, they're vibrant, they attract people, they revitalize the area, they don't harm traffic safety. If the city says that's possible, there has to be some way for Vanguard to say, me too. My properties have that same quality. And if the city, right now the city, there's no way to do other than to go to a city council meeting, try to get it on the agenda, but the city has continued to pass these things over and over again. It hasn't put a cap on where these super graphic signs are appropriate, which distinguishes this case from Metrolight's, because the Metrolight's case held specifically that the regulation from the city of San Diego put a firm cap on the amount of signs that was being allowed. And that's why it passed constitutional muster. Here, the city isn't capping super graphic signs. It may have capped super graphic signs in Hollywood once 99% of the eligible properties in Hollywood could have a super graphic sign. I would submit that if there's somebody who's left out in the SUD, if there's a I don't see how the city could continue to sustain the justification for banning new signs when 90% of the area already has signs. Is your argument, isn't your argument, it's next to me of an equal protection argument rather than a free speech argument? Or is it a combination of both? Well, it's a combination of both. And the reason it's analyzed under central Hudson is the state trustees of State University of New York, the Fox case, said specifically that this type of you can speak here but not here regulations, even if content neutral, is the same thing as the central Hudson test. And I believe the Supreme Court has also said that the equal protection analysis in the context of free speech is the same as the central Hudson test. So when you have a content neutral ordinance, or facially, but it's being applied to say one speaker can speak here and use this method of communication, but not this other speaker not here. That's still analyzed under the central Hudson test, because it is a right of free speech. Which element are you claiming of central Hudson is not satisfied by what the city's done? All three. The first element is not the city's burden. The first element is satisfied. That's our burden to show that we are engaged in truthful, non-misleading speech. There's been no argument that we have been engaged in untruthful speech. The statutes aren't addressed to that. The remaining three elements is they have to present a compelling state interest. Now, once they say that super graphic signs do not harm aesthetics and do not harm traffic safety, they can't come back and say, just everybody knows that they harm aesthetics and traffic safety. They haven't introduced evidence. What they're saying is, and I don't think you've produced evidence to the contrary, that if you put them in these suds and put them in, you know, all in one place, you're going to overall eliminate the disruption to traffic and the aesthetics throughout the remainder of the city. And so there's a justification for forming these districts where super graphics are okay, and then they don't want the clutter and the risk to safety in other places, like along the 10 freeway. They'd rather have them all at Staples or all at Hollywood, and then no more, because to a certain extent, it's overwhelming to have all those signs in Hollywood. Well, I'm not saying that they couldn't... I'm saying when they make that judgment, if they do, if they say here and no more, first, it can't be tied to the receipt of development money or the receipt of other payments for the creation of SUDs. And I think the record establishes that that is a primary reason why certain of these SUDs were created, including the most recent, the single property SUD of the Wilshire Grand SUD. The other thing is, if the city makes a decision of where super graphic signs are appropriate, it has to make a decision and it has to be based on evidence, careful study, that's from the Fox case, and that evidence has to be presented to this panel, to the trial court and this panel, that they have made a careful study of where super graphics are appropriate and where they're not. And that can't be tied to anything ulterior. It can't be tied to generating revenue. You have no evidence that there's ulterior motivation or intentional discrimination. And what is your evidence? Our evidence that the most recent city council meeting approving the Wilshire Grand SUD, the city council members who spoke were very clear that they were asking, where's the money in it for the city, for this Wilshire city council look and go, okay, this is the area we think super graphic signs are allowed, there you go, done. And have it be the end of the game there. They didn't. They put it where the developer redeveloped, and then another developer redeveloped, and then they moved the boundaries or they created more. Actually, they put in the area where the original convention center was and always was, and the whole area was approved. And why isn't that a rational legislative judgment? And tax revenues to the city at the same time. What's wrong with that? What's wrong with it is it's not being applied equally to other areas that could have that same benefit, and there's no reason. Why should you decide that or we decide that? Isn't that up to the city? It's the city has to make that decision, though. They haven't. It's like if one person comes to the city council meeting and says, I'd like to display some sort of sign on my house, and the city council meeting goes, okay, great, let's draw an SUV around your house, and you can sign it, and then everybody goes away. Well, everybody else who owns a house in the neighborhood would go, well, why not me? And then to respond and say, this is merely a legislative judgment. We think this house is appropriate. With no study as to why no others similarly situated people. That wasn't the hypothetical that Judge Wardlaw suggested. I mean, under your view, that you couldn't have SUDs at all, because it may be that you can tolerate a certain number for the reasons that Judge Wardlaw suggested, and no more. Otherwise, these signs would have no basis to do except what they did in Hollywood, and that's no more signs. Well, let me make one point on that, and I'll reserve my time for rebuttal, about the fear of proliferation. The evidence in our record shows about 200 plus or minus, however many dozens, super graphic signs within the SUVs right now. When Worldwide Rush got its injunction from the trial court, it had 19 signs. Vanguard had four. Two other sign companies, Skytag and Liberty Media, had three each. It's 29 signs. You quadruple that over, and you're not even to the number of signs that are existing right now. I mean, at some point, the city has to say, okay, the ban doesn't support the aesthetics rationale, at least in commercial areas similarly situated, because we've made that decision so many times that the remaining commercial areas should be able to say the same thing, should have some mechanism to come to the city council and say, my commercial area is exactly the same. I'm being deprived of my free speech rights. I should be able to speak just like everybody else. I will bring the exact same benefits. There has to be a decision. There has to be a rational decision with evidence and studies supporting it for the city council to tell my client, no, you may not speak. And with that, I reserve my time. Thank you, counsel. Good morning, your honors. Kenneth Fong for City of Los Angeles. I think this case is just the last part of a series of cases that have come before the district court and before this court several times. We start with the Metro Media case that was in front of the U.S. Supreme Court. And basically, what Metro Media says is that cities have the authority  and the pivotal part of the analysis there is the third prong of Central Hudson, which asks the question, does the overall ban still further the city's interest of aesthetics and traffic safety despite carving out some exceptions? The big exception in Central Hudson, in Metro Media, was on-site signs. And on-site signs, there was no numerical limit in the city of San Diego. Those, over time, will presumably grow in number. And then we have the Metro Lights case, which extended the reasoning in Metro Media. The city of L.A. had its street furniture program, and this court upheld the ban as well, despite the city carving out exceptions for street furniture signs. Then, most recently, we had Worldwide Rush, where the pivotal issue was whether the city could create, essentially, sign districts, limited areas where we are going to allow signs, and yet we're still going to preserve our ban in the rest of the city. I just want to go through and point out a couple of areas where I think that my opposing counsel may have made an error. First of all, on the standard of First Amendment review. Twice I heard him say that there needs to be a compelling reason. That's not the standard under Central Hudson. Central Hudson is the test devised by the Supreme Court for commercial speech. Up until that time, it had basically received no protection, and so the Supreme Court was saying, we are going to extend protection to commercial speech, but it's going to be more limited than it is for classic speech, such as political speech and non-commercial speech. So, we have to start with that, the standard. We look at Central Hudson. Now, the other thing about the Central Hudson test is, I don't believe that it's the first and second prongs, I don't believe they have any play here. I believe it's just the third prong, because the first prong is whether the speech is lawful activity. Well, we can see that. It's lawful for them to have billboards. Number two, whether the restriction seeks to implement a substantial governmental interest. In Metro Media, the Supreme Court said, we are going to presume that aesthetics and traffic safety are substantial governmental interests, and a later case, which I cite in my brief, the Ackerley case, the court there said, cities don't need to do individual studies every time they're going to enact a ban. We're going to presume it because it's so common sense that we don't need to require studies. I would also like to point out that Judge Collins, at the district court level, in her opinion, she cited a statement from the Metro Lights case, and in essence, what that statement says is, it would be strange for a court to uphold a city's ability to create SUDs and then not let them do it. So, I think that's the real problem here. This court has, twice now, in Metro Lights and a worldwide rush, upheld the city's ability to make reasonable judgments, deferred to the city's ability to make reasonably graduated decisions as to how they're going to address signage in a particular city. And for a company like Vanguard to come here and say, well, the city doesn't have that ability, I think it undercuts the worldwide rush decision. And as far as numerical limits, the city of Los Angeles is a huge city. The square miles of the city are about 490 square miles. That's much larger than most other cities. And at some point, I would think that the political process would take over. I think, I know personally that there are people in the city, they're not going to allow the entire city to be covered by signs to the extent that the purposes of the ban will be eviscerated. I think. You can see at some point that if that were to happen. Yes. If the city started letting some signs by some companies on the 10 freeway, but not others by other companies, then you might be approaching a violation of the. Well, if it was done based on companies. But these are legislative decisions. The city is making legislative decisions. More land use. Yes, it's more land use. And there is a deference, it's a separation of powers issue also. The courts have historically deferred on classic land use decisions such as this. And I know that there's a first amendment overlay, but this court and the Supreme Court has decided that we are going to defer to a city's ability to make these classic legislative decisions. And I suppose at some point, perhaps, too much would be too much. But I don't think that this is the case. I think that Vanguard is very much just trying to follow in the footsteps of Worldwide Rush. And Worldwide Rush, they were unsuccessful. And Vanguard should not succeed where Worldwide Rush did not. I want to ask you a question that's slightly off point. And I think it was raised by one of the other cases that came up. But in reading the ordinance, there are certain exemptions in the ordinance for noncommercial, political, or ideological signage. Yes. And I'm just wondering why that wouldn't violate the Constitution. No, no, that doesn't. That's put in to comply with the Constitution. Because? It's called the Substitution Clause. And in the city of Los Angeles, we do not want to discriminate against political signage or noncommercial signage. What happened in other cities is that there were cases brought where the plaintiff said you're allowing commercial signage, but you're not allowing noncommercial signage or political speech. So what the city started to do, and we're one example, is to just put what are called substitution clauses that allows anyone to put noncommercial speech or political speech on any lawfully permitted sign in the city. So they can never make the claim that you're discriminating against us because we have noncommercial speech or political speech. Is that the content-based distinction between commercial speech and noncommercial speech? Well, it's not really content-based. We're just basically saying whatever we give to commercial speech, we're going to allow you to have for noncommercial speech. In fact, it's eliminating the content. Actually, in the temporary ban context, the temporary ban rules don't apply to the noncommercial and the political, right? Yes. Our temporary bans were on commercial billboards, and the permanent bans are also. Okay. I'm just wondering, you know, as we go forward and people get more and more creative, what's going to happen if you all of a sudden have super graphic political signage that wants to pop up on the tin? We've already had that. Okay. You sort of see only the tip of the iceberg. We've already had that where we have, in fact, you have a case that was on the docket, the Charles case. Right. That was the distinction between noncommercial and commercial, and you took it off the docket because it's... It's merged into another appeal. That's right, but I assume that it will be coming back at some point. Yes, we do have that issue where because we have a ban, and we've been vigilantly enforcing it now, that sign companies are getting very inventive, and they're putting things up, and they're saying, hey, it's noncommercial speech. It's not really commercial, but it really is commercial. That's the question, isn't it? That is the question. It's a very difficult one, but I think that the courts have had to use their common sense also and say to themselves, well, we know when something is commercial. You can't just say it's noncommercial or something else and let it get by. So you're right. That will continue to be an issue, though. Thank you. Thank you. Do you want a couple of minutes for rebuttal? With respect to the test that's to be applied to this case, I know your Honor, Judge Corman asked that question. Here's the citation from the State Board of Trustees of the University of New York v. Fox. It's page 477, and they say, quote, we said that the application of the Central Hudson test was substantially similar to the application of the test for validity of time, place, and manner restrictions. That's, we're analyzing this under Central Hudson, even though it appears to be a content-neutral time, place, and manner. What counsel said and what this panel has asked is, isn't this a legislative decision? It is, but under Central Hudson, they have to articulate reasons, they have to apply them consistently, and they have to have carefully studied the manner. And it's the city's burden to present evidence that has undertaken each of those steps. The city doesn't introduce any evidence whatsoever of any deliberation process, any thought process of either creating the sign ban or making any of the exceptions. The city's evidentiary showing is just void. And the case law is abundantly clear. The city bears the burden of proof on the remaining three elements of Central Hudson. And finally, when Judge Wardlaw asked about the non-commercial commercial distinction, and that being a content-based distinction, that's, the case directly on point is the Supreme Court's case in Discovery Network versus Cincinnati. That, where they held specifically that you can't allow non-commercial speech but ban commercial speech simply because you'll have less speech. And limited the holding of Metro Media in footnote 20 to that specific point, or actually the reversal of that point. You couldn't ban commercial speech but not non-commercial speech. You got to pick one or the other. And once you have that, the city's escape clause, well, it may have been written for Metro Media, doesn't apply, or it renders the statute, renders the exceptions on constitutional under Discovery Network. Thank you. Thank you, counsel. Vanguard Outdoor versus City of Los Angeles is submitted. And this session of the court will be adjourned. All rise. This court will be discussed at the end of the hearing.
judges: Korman, Noonan, Wardlaw